*Richard A. Edwards v. State of Maryland*, No. 47, September Term, 2016.  Opinion by Greene, J.

**CRIMINAL JUSTICE—POST-CONVICTION DNA TESTING**

Pursuant to § 8-201 of the Criminal Procedure Article, persons convicted of crimes of violence are entitled to post-conviction DNA testing upon a showing that "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing and the requested DNA test employs a method of testing generally accepted within the relevant scientific community."  The statute does not require a petitioner to show that the outcome of his or her case necessarily would have been different, had the jury been presented with the evidence the petitioner seeks to obtain through the requested DNA testing.  In other words, the petitioner need not show that the DNA testing has a reasonable probability to *exonerate* the petitioner.  Instead, as clearly delineated in the statute, the petitioner need only show that there is a reasonable probability that the testing has the scientific potential to produce *exculpatory* or mitigating evidence.  Exculpatory evidence is evidence that tends to establish the innocence of the petitioner.  It need not definitively prove the petitioner's innocence but only *tend* to prove or disprove a disputed material fact.

The Circuit Court applied the incorrect legal standard in ruling that there was no possibility that DNA testing of the requested items would "exonerate" the Appellant.

Circuit Court for St. Mary's County
Case No. 18-K-10-000193
Argued: January 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 47

September Term, 2016

_____

RICHARD A. EDWARDS

v.

STATE OF MARLAND

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.

_____

Filed: May 24, 2017

This is a direct appeal pursuant to the DNA testing provisions of the DNA Evidence-Post Conviction Review. Md. Code (2001, 2008 Repl. Vol., 2016 Supp.), § 8-201 of the Criminal Procedure Article (Crim. Pro.). Appellant Richard A. Edwards seeks our review of the denial, by the Circuit Court for Saint Mary's County, of his Petition for Post-Conviction DNA Testing. For the reasons set forth below, we shall vacate the judgment of the Circuit Court and remand this case to that court with directions to order the DNA testing of the cigarette lighter.

## BACKGROUND

### Procedure

On May 12, 2010, a grand jury sitting in the Circuit Court for Saint Mary's County returned an indictment in three counts charging Appellant with committing attempted first-degree rape, third-degree sexual offense, and second-degree assault.[1] These charges went before a Circuit Court jury for trial on February 8 and 9, 2011, following which the jury convicted Appellant on all counts. On February 9, the trial court sentenced Appellant to life imprisonment for the attempted first-degree rape, and imposed a concurrent ten years' imprisonment for the third-degree sexual offense. The second-degree assault merged. Appellant lodged a direct appeal with the Court of Special Appeals, which, in an unreported opinion, affirmed in all respects.

---

[1]Md. Code (2002, 2009 Supp.), § 3-309 of the Criminal Law Article (Crim. Law) (attempted rape in the first degree); Crim. Law § 3-307 (sexual offense in the third degree); Crim. Law § 3-203 (assault in the second degree).

On or about September 14, 2015, Appellant filed a Petition for Post-Conviction Relief in the Circuit Court for Saint Mary's County. On January 4, 2016, the Circuit Court granted Appellant's motion to withdraw this first Petition, and on that date Appellant's Petition for Post-Conviction DNA Testing was filed pursuant to Crim. Pro. § 8-201 and Maryland Rule 4-701.[2] A hearing on the petition was held on June 14, 2016 before a Circuit Court judge ("Post-conviction Court"), who, in a written opinion and order issued on July 6, 2016 denied the petition.[3] On July 21, 2016, Appellant noted a direct appeal to this Court pursuant to § 8-201(k)(6).[4]

## Facts

The operative facts are not in dispute.[5] At the trial, the jury heard testimony that, on the evening of February 12, 2010, the complainant, J.K.,[6] went to the Big Dogs Paradise bar in Mechanicsburg. She arrived at 9:00 p.m. and remained there until the bar closed at 2:00 a.m. the next morning. After leaving the bar, Ms. K., accompanied by some friends, went outside to smoke a cigarette and socialize. Soon thereafter, the others left, and Ms.

---

[2] Title 4, Chapter 700 of the Maryland Rules governs "Post-Conviction DNA Testing."

[3] The Post-conviction Court set forth its reasons in a separate "Statement of Reasons and Opinion of Court."

[4] *See Thompson v. State*, 411 Md. 664, 681-82, 985 A.2d 32, 41-42 (2009). *See also Brown v. State*, 431 Md. 576, 583, 66 A.3d 675, 679 (2013).

[5] The Post-conviction Court held a hearing on Appellant's Petition, but that proceeding was limited to argument. The Post-conviction Court made no findings of historical fact.

[6] We shall refer to the Complainant by her initials (or "Ms. K.") to protect her privacy. *See Thomas v. State*, 429 Md. 246, 252 n. 4, 55 A.3d 680, 684 n. 4 (2012).

2

K. decided to call a friend, Alex, for a ride home because she had been drinking. She returned to her car, locked the doors, and called another friend, Mark, to pass the time until her ride arrived.

While Ms. K. was on the phone with Mark, a man approached her car and identified himself as a "security guy" at Big Dogs. He claimed that he wanted to ensure Ms. K. had a safe ride home. Ms. K. told the man that she had a friend on the way to give her a ride and the man left. A few minutes later, however, while Ms. K. was still on the phone, the man returned to her car with a cigarette in his hand and asked to borrow her lighter. When Ms. K. gave the man her lighter, he asked to use her door to shield him from the wind while he lit his cigarette. Ms. K. agreed. The man crouched down in front of the passenger door to light the cigarette, but then he entered her car and sat down. When Ms. K. told the man to get out of her car he did not comply.

Ms. K. then told the man she needed to go to the bathroom and that she was going back to the bar to see if she could use the bathroom. The man responded, "Oh no, I work for Big Dogs, they are closed. They won't let you back in there." Ms. K. then said "Well, I'm gonna go check." She then ended her phone call with Mark, opened her door and started to get out.

The man got out of the car about the same time and pushed Ms. K. to the ground. He then pulled Ms. K. back up and pushed her into the driver's seat of the car. At that point, he fondled her, kissed her neck, and attempted to pull down her pants, placed his fingers in her vagina, and attempted to force her to have sexual intercourse with him. At

one point during the attack, the man took Ms. K.'s keys and threw them. Ms. K. managed to retrieve her keys and start the ignition. She "gunned it" and the man fell out of the car and ran toward the back of the bar. Ms. K. drove to the front of the bar and continuously honked her horn until some of the Big Dogs bouncers came out. When these employees asked what was wrong, Ms. K. reported that a man tried to rape her. The police were summoned.

Officers processed Ms. K.'s car for fingerprints, and investigators also recovered some items from the car that the suspect could have touched, including a Bic lighter, a Forever 21 plastic shopping bag, and a pack of Marlboro Menthol cigarettes. Ms. K. did not go to the hospital on the night of her attack and the police did not take her clothing for examination. The police did not submit any evidence for DNA testing from Ms. K., her car, or the items in the car.

Ms. K. testified that she had not known her attacker, but recalled that she had seen him earlier that night inside the bar. Ms. K. described her attacker as having brown hair and dark eyes, being in his late thirties to forties, and wearing a long-sleeve denim button-up shirt. Based on Ms. K's description of her assailant and on interviews with the employees and owners of Big Dogs, the police had initially identified a man named Richard Wathen as a suspect. The police showed Ms. K. two photo arrays, each containing a photo of a St. Mary's county resident named Richard Wathen. Ms. K. was unable to make a positive identification from these arrays.

The police later identified Appellant as a possible suspect and compiled a photo array with Appellant's picture, which they showed to Ms. K. She positively identified

4

Appellant as the man who assaulted her in the parking lot outside of Big Dogs. Ms. K. later testified that she was "positive" of her identification of Appellant as the man who assaulted her. At trial, Ms. K's friend Mark, who was on the phone with her that evening during her interaction with her assailant, recounted that Ms. K. had said she was at Big Dogs and that during their conversation, Mark could hear a person with a male voice asking for a light or a cigarette.

The co-owner of Big Dogs, Victoria Adkins, had been working at the bar that evening and testified that she had spoken with Ms. K. about the incident. Ms. Adkins testified that after hearing Ms. K. describe the man who attacked her, Ms. Adkins came to the conclusion that the man was Ricky Edwards, who was at the bar that evening and wearing a denim button-up shirt. Brian Adkins, who also owns Big Dogs, testified that when he heard Ms. K.'s description, he thought the person's name was Ricky. Mr. Adkins also said Ricky was at the bar that evening and was wearing a blue denim button-up shirt.[7] A bar employee named James Dougherty testified that he believed the man who Ms. K. described was Appellant, a man with whom Mr. Dougherty had had an altercation on the night in question. Before trial, Mr. Dougherty positively identified Appellant in a photo array shown to him by police as the man he saw in the bar that evening.

At trial, Appellant called the investigating detective, Det. Thomas Hedderich, as a defense witness. Det. Hedderich testified that he interrogated Appellant and that Appellant

---

[7] Mr. Adkins initially told police the man's name was Ricky Wathen, but later discovered that his last name was not Wathen. Mr. Adkins testified at trial that Appellant was known as "Ricky."

5

did not confess to the crime despite the fact that the detective lied to Appellant, claiming that police had obtained DNA evidence, that the incident was captured on video, and that an undercover narcotics officer had seen the incident. Appellant also testified in his own defense and acknowledged that he was at Big Dogs from 12:30 am to 1:30 am, when he left the bar in the car that his wife drives. Appellant denied having any contact with Ms. K. on the night in question. Appellant finally testified that he has green eyes, and that he has a rotten tooth and missing teeth, which he displayed at trial for the jury.

**The Post-Conviction Petition**

In his post-conviction Petition, Appellant asserted that there was a reasonable probability that DNA testing of the requested items has the scientific potential to produce exculpatory evidence relevant to his claim of wrongful conviction. Appellant noted that the victim testified that the perpetrator used her lighter and two witnesses testified that the victim told them the perpetrator asked her for a cigarette. Appellant maintained that it is likely that the perpetrator transferred epithelial cells to the lighter when he used it and that the perpetrator could also have touched the Forever 21 bag and the cigarette pack given his proximity to those items when he sat in the passenger seat. [8]

Appellant contended that "even with minute or degraded quantities of DNA, it is 'frequently possible to obtain successful DNA results from cellular material transferred from the skin of an individual who has simply touched an object.'" (quoting Ray A. Wickenheiser, *Trace DNA: A Review, Discussion of Theory, and Application of the*

---

[8] Appellant used the term "skin cells," but for the sake of clarity and consistency with the statute, we equate skin cells with the synonymous term "epithelial cells."

6

*Transfer of Trace Quantities of DNA Through Skin Contact*, 3 J. FORENSIC SCI. 442 (2002)). The petition noted Wickenheiser's observation that cigarette lighters specifically are an "unusual exhibit material yielding successfully DNA profiles using polymerase chain reaction (PCR) and short tandem repeat (STR) typing."

Appellant further asserted that the testing could show that his DNA was absent on all of the tested items but that the DNA profile of another individual may instead be present on the items. Appellant argued that this would not only support his testimony that he was falsely identified as the perpetrator but it also has the potential to identify the actual perpetrator. Finally, the petition asserted that the DNA testing requested, including polymerase chain reaction (PCR) and short tandem repeat (STR) testing, are generally accepted as reliable in the relevant scientific community.

As noted, a hearing on the petition was held on June 14, 2016 in the Circuit Court for St. Mary's County. At the hearing, the State did not challenge whether the DNA testing requested by Appellant is employed by a method generally accepted within the relevant scientific community. Rather, the focus of the hearing was whether there was a reasonable probability that the testing requested has the scientific potential to produce exculpatory evidence relevant to Appellant's claim that he was not the individual who assaulted Ms. K.

On July 6, 2016, the Post-conviction Court issued an order denying Appellant's petition for DNA testing. The order was accompanied by a written opinion, which stated in pertinent part:

> As previously stated, the standard in CP § 8-201(d)[(1)](i) is that there must be a "reasonable probability . . . that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence." Because of the

7

highly speculative nature of what petitioner hopes to gain from DNA testing of these items, this [c]ourt can see no possibility that a DNA test performed on the items requested would exonerate Petitioner. Even if petitioner's DNA is not found on the items and other persons' DNA is found, that does not prove or even suggest that any of those other people committed this crime, even if one of them turns out to be a convicted sex offender.

Here, there is no instrument that was used to commit the crime, and therefore, no relevance to finding the DNA of random people on the items Petitioner seeks to have tested. The [c]ourt need not "conduct a fishing expedition to indulge every permutation" that Petitioner might imagine.

The Post-conviction Court continued:

In this case, it is noteworthy and even dispositive that, at trial, the victim positively identified Petitioner as the perpetrator. She was able to give the police a description of him and what he was wearing. She testified that she got a good look at him because "[h]e was in my face quite a bit . . . I had seen him earlier in the bar . . . I said that guy looks like a creeper because he kept looking at me as we were dancing." In addition, the victim identified Petitioner for the jury and testified to identifying Petitioner in a photo array. Trial counsel cross-examined the victim and she did not waiver in her identification of Petitioner.

The judge distinguished cases where relief had been granted:

This is clearly different than *Gregg* where it was highly probative that the killer had handled a gun which was the murder weapon and the DNA on the gun would have a reasonable probability of producing exculpatory evidence that would corroborate defendant's claim that he was not the shooter. This was especially true given the ambivalent evidence which did convict the Petitioner. It is also different than *Brown* where the defendant was challenging whether the crime had actually happened and wanted the items tested to disprove it had. Here, there is no such probability that the testing would produce exculpatory or mitigating evidence for the Petitioner.

(citations omitted).

On July 21, 2016, Appellant noted a direct appeal to this Court pursuant to § 8-201(k)(6), and presents the following question on appeal:

Did the Circuit Court err when it denied Mr. Edwards' Petition for Post-

Conviction DNA Testing, where a reasonable probability exists that the requested testing has the scientific potential to produce exculpatory evidence relevant to Mr. Edwards' claim of wrongful conviction?

For the following reasons, we shall answer the Appellant's question in the affirmative and remand the case to the Post-conviction Court for to order testing.

## DISCUSSION

### Standard of Review

There is some dispute as to the appropriate standard of review. The State insists at length that our review of the Post-conviction Court's ruling is for an abuse of discretion. We do not agree. Because we are asked to interpret the language in the post-conviction DNA testing statute, and to determine whether the hearing judge applied the correct standard of law in denying Appellant's petition, our review is plenary.[9] *See Fuster v. State*, 437 Md. 653, 671, 89 A.3d 1114, 1124 (2014) ("An appellate court reviews without deference the legal standard that a trial court uses in ruling on a petition."). *See also, e.g., Howard v. State*, 440 Md. 427, 434, 103 A.3d 572, 576 (2014).

The cases cited by the State in support of its version of the appropriate standard of review for an abuse of discretion, do not support its argument on this record. *Brown v. State*, 431 Md. 576, 66 A.3d 675 (2013); *Washington v. State*, 424 Md. 632, 37 A.3d 932 (2012); *Arrington v. State*, 411 Md. 524, 983 A.2d 1071 (2009). In each of the cases upon which the State relies, we were asked to review the circuit court's denial of a motion for a

---

[9] Specifically, we shall review the statute to determine when and whether a post-conviction DNA petitioner is entitled to DNA testing of evidence in the State's possession and the meaning of the terms "reasonable probability" and "exculpatory" under the statute.

9

new trial. By contrast, in the case before us, the Post-conviction Court concluded that the sought after DNA testing could not yield results that would exonerate Appellant. The Post-conviction Court effectively denied Appellant's Petition as a matter of law.

**Parties' Contentions**

On appeal, Appellant maintains that a reasonable probability exists that the testing has scientific potential to produce exculpatory evidence relevant to Appellant's claim of wrongful conviction. Ms. K. told the jury that her attacker used her lighter and moreover, photographs of the crime scene show a Forever 21 bag and a pack of cigarettes on the edge of the passenger seat where the attacker sat before the assault. Appellant maintains that it is likely that the perpetrator of the crime transferred epithelial cells onto the lighter when he touched it and that it is also likely the perpetrator could have touched the cigarette pack or Forever 21 bag given his proximity to those items.

Further, Appellant urges that the hearing judge applied the wrong standard in denying the petition when the judge ruled that "the [c]ourt can see no possibility that a DNA test performed on the items requested would exonerate the Petitioner." Appellant insists that the proper standard is not whether DNA testing would "exonerate" him or that such testing would "prove" someone else committed the crime. Instead, Appellant contends that the proper inquiry is whether a reasonable probability exists that the testing has the scientific potential to produce exculpatory or mitigating evidence relevant to the claim of wrongful conviction or sentencing. Appellant posits that this case turns upon the meaning of exculpatory, which, he argues, sweeps more broadly than the term exonerating. Appellant also argues that the inclusion of the terms "or mitigating" and "or sentencing"

10

in the statute show that the standard is one of exculpatory evidence and not exonerating evidence. Finally, Appellant avers that the absence of his DNA on an item where one would expect the perpetrator's DNA, although not necessarily exonerating, is certainly exculpatory to the extent that it would tend to establish that Appellant was not the person that assaulted Ms. K. In other words, negative DNA results would satisfy the broader, less stringent threshold for entitlement to DNA testing than the standard advocated by the State and applied by the post-conviction court.

Urging that we affirm, the State avers that Appellant's hoped-for outcome of DNA testing would not be exculpatory. The State first notes that there is no evidence that the assailant touched the Forever 21 bag and the cigarette pack, thus the absence of his DNA on these items would in no way tend to exonerate him. The State explains that the testing would reveal one of two things—either Appellant's DNA is on the lighter or it is not—and argues that neither is exculpatory. The State contends that the best result for Appellant is that Appellant's DNA is not on the lighter and notes that the jury was already told that there was no DNA evidence in this case inculpating Appellant.

### Crim. Proc. § 8-201

We agree with Appellant that the standard to be employed by a post-conviction court in the analysis of a petition for DNA testing does not require the proponent to establish that the results must, in all instances, exonerate the defendant. We also conclude that our decision in *Brown* is, on this record, inapposite.

Maryland's post-conviction DNA testing statute, which was enacted by the General

11

Assembly in 2001, is codified at § 8-201 of the Criminal Procedure Article.[10] "Section 8-

---

[10] Section 8-201 provides in relevant part:

**§ 8-201.  DNA evidence – Postconviction review.**

\* \* \*

(b) *Filing of petition*. -- Notwithstanding any other law governing postconviction relief, a person who is convicted of a crime of violence under § 14-101 of the Criminal Law Article may file a petition:

   (1) for DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction; or

   (2) for a search by a law enforcement agency of a law enforcement data base or log for the purpose of identifying the source of physical evidence used for DNA testing.

(c) *New trial*. -- A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and a substantial possibility exists that the petitioner would not have been convicted without the evidence.

(d) *Findings requiring DNA testing*. --

   (1) Subject to subsection (e) of this section, a court shall order DNA testing if the court finds that:

      (i) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

      (ii) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

   (2) A court shall order a data base search by a law enforcement agency if the court finds that a reasonable probability exists that the data base search will produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing.

\* \* \*

201 entitles persons convicted of certain serious crimes to pursue DNA testing of physical evidence that is in the possession of the State and might produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing." *Simms v. State*, 409 Md. 722, 727, 976 A.2d 1012, 1015–16 (2009). *See also* Md. Rule 4-703(2)(A).

The statute was enacted "in line with a nationwide trend to adopt post-conviction DNA testing statutes designed to provide an avenue for the exoneration of the actually

---

(i) *Disposition upon receipt of results*. --

(1) If the results of the postconviction DNA testing are unfavorable to the petitioner, the court shall dismiss the petition.

(2) If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:

(i) if no postconviction proceeding has been previously initiated by the petitioner under § 7-102 of this article, open a postconviction proceeding under § 7-102 of this article;

(ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7-102 of this article, reopen a postconviction proceeding under § 7-104 of this article; or

(iii) on a finding that a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial, order a new trial.

(3) If the court finds that a substantial possibility does not exist under paragraph (2)(iii) of this subsection, the court may order a new trial if the court determines that the action is in the interest of justice.

(4) If a new trial is granted, the court may order the release of the petitioner on bond or on conditions that the court finds will reasonably assure the presence of the petitioner at trial.

13

innocent." *Blake v. State*, 395 Md. 213, 219, 909 A.2d 1020, 1023 (2006). We have stated that the purpose of Crim. Proc. § 8-201 is to "facilitate the establishment of claims of actual innocence for serious crimes." *Thompson v. State*, 395 Md. 240, 252, 909 A.2d 1035, 1042 (2006).[11]

Under Crim. Proc. § 8-201, persons convicted of certain crimes of violence may file a petition requesting "DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction."[12]  Crim. Proc. § 8-201(b)(1). "Scientific identification evidence" is defined in Crim. Proc. § 8-201(a)(5) as evidence that

> (i) is related to an investigation or prosecution that resulted in a judgment of conviction;
>
> (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and
>
> (iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

---

[11] "The statute has undergone a number of amendments since its enactment in 2001, and because we have discussed its legislative history on several occasions, we do not repeat that discussion here." *Simms v. State,* 409 Md. 722, 727–28, 976 A.2d 1012, 1016 (2009) (citing *Gregg v. State*, 409 Md. 698, 708–12, 976 A.2d 999, 1004–07 (2009)). *See also Jackson v. State*, 448 Md. 387, 395–401, 139 A.3d 976, 980–84 (2016) (discussing the most recent amendments to Crim. Proc. § 8-201). The statute was most recently amended by 2015 Md. Laws, ch. 369, § 1, which took effect on October 1, 2015, before Appellant filed his petition for DNA testing. Accordingly, any reference made to Crim. Proc. § 8-201 in this opinion is to the version of the statute current through the date of this opinion, unless otherwise specifically noted.

[12] Maryland Rules 4-701 *et seq.* govern post-conviction DNA testing procedures. Maryland Rule 4-704 governs the contents of a petition for DNA testing.

14

Crim. Proc. § 8-201(a)(5).[13] "Biological evidence" is defined as evidence that "includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained." Crim. Proc. § 8-201(a)(2). The statute mandates that a court grant a petition for DNA testing if the court finds:

> (i) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

> (ii) the requested DNA test employs a method of testing generally accepted with in the relevant scientific community.

Crim. Proc. § 8-201(d)(1).

Here, the parties do not disagree that the requested DNA test employs a method that is generally accepted within the relevant scientific community. Hence, there is no dispute that Crim. Proc. § 8-201(d)(1)(ii) is satisfied. At issue in this case is whether a reasonable probability exists that the requested testing has the scientific potential to produce exculpatory evidence relevant to the Appellant's claim of wrongful conviction.

> Again, in denying the petition, the post-conviction judge reasoned:

> Because of the highly speculative nature of what Petitioner hopes to gain from DNA testing of these items, this [c]ourt can see no possibility that a DNA test performed on the items requested *would exonerate* Petitioner. Even if Petitioner's DNA is not found on the items and other persons' DNA is found, that *does not prove* or even suggest that any of those other people

---

[13]All of the evidentiary items at issue in this case, the Forever 21 bag, the cigarette pack, and the lighter, meet the statutory definition of "scientific identification evidence." Md. Code (2001, 2008 Repl. Vol., 2015 Supp.), § 8-201(a)(5). These items are related to the investigation of Appellant to the extent that the police collected these items from the scene of crime for processing. *See generally, Wallace v. State*, ___ Md. ___, ___, ___ A.3d ___, ___, 2017 WL 1422828 *8 (filed April 21, 2017).

15

committed this crime, even if one of them turns out to be a convicted sex offender.

(Emphasis added). The theory of the court's denial, that the proposed DNA analysis would not exonerate Appellant, leaves no room for the broader reach of the statute as indicated by the term "exculpatory." The State argues that the hearing judge applied the appropriate standard. On this point, the parties are in disagreement, specifically over the meaning and application of the term "exculpatory."

The term "exculpatory" as employed in the statute embraces a far broader scope of relief than the "zero sum" standard characterized by the term "exonerate" and advanced by the State and applied by the Post-conviction Court. The sought after testing of objects described by Ms. K., most notably the cigarette lighter, have the "scientific potential to produce exculpatory or mitigating evidence." Nothing in the plain language of the statute suggests that the testing results must "exonerate" a petitioner or "prove" that someone else committed the crime.

Although the General Assembly did not define the word "exculpatory" in the statute, we are able to discern the term "exculpatory" with its plain and ordinary meaning. *See Ali v. CIT Tech. Fin. Servs., Inc.*, 416 Md. 249, 262, 6 A.3d 890, 897–98 (2010) ("When the Court can ascertain the Legislature's intent from the plain meaning of the verbiage, the Court need not delve deeper. . . . In seeking to apply the plain-meaning rule, it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning."). Black's Law Dictionary defines exculpatory as "evidence tending to establish a criminal

defendant's innocence." BLACK'S LAW DICTIONARY at 577 (7th ed. 1999). This is consistent with the policy of the statute - to facilitate claims of actual innocence.

Our cases confirm this conclusion. In *Gregg v. State*, 409 Md. 698, 976 A.2d 999 (2009), we discussed § 8-201(d)(1) and noted that:

> Given that the statute only requires a showing that the desired testing has a reasonable probability that the DNA testing of the epithelial cells has the scientific potential to produce relevant exculpatory or mitigating evidence, the petition, on its face, satisfies that standard. Appellant *was not required to show that the outcome of his case necessarily would have been different, had the jury been presented with the evidence he seeks to obtain through the requested DNA testing.* That is why the State's argument on appeal, that the evidence at trial "overwhelmingly" established Appellant's guilt, does not defeat the *prima facie* case that the petition makes for satisfaction of the requirement set forth in § 8-201(c)(1).

*Gregg*, 409 Md. at 720, 976 A.2d at 1011 (emphasis added).

Our decision in *Thompson v. State*, 411 Md. 664, 985 A.2d 32 (2009), is also instructive. The defendant in that case filed for post-conviction relief, asserting that the results of DNA testing established that he had been convicted of rape, felony murder and associated offenses in error. One issue before us was whether the "more liberal" standards for the granting of a new trial should apply to Thompson's case.[14] In 2008, the General Assembly amended the DNA provisions of the Criminal Procedure Article by adding, *inter alia,* the following standard for the post-conviction court to apply in assessing a motion for a new trial:

> A petitioner may move for a new trial under this section on the grounds that the conviction was based on unreliable scientific identification evidence and

---

[14] *See* 2008 Laws of Maryland, chap. 337, § 1, *abrogated* December 31, 2013. *See id.,* § 4.

17

a substantial possibility exists that the petitioner would not have been convicted without the evidence.

Md. Code (2009 Supp.), § 8-201(c). We held that, although Thompson had filed for post-conviction relief prior to the effective date of the amendment, January 1, 2009, the appropriate standard for the post-conviction court to apply should be the above provision, Section 8-201(c), as added in 2008. *Thompson*, 411 Md. at 683-84, 985 A.2d at 43. In a footnote, we further commented on the appropriate standard, and this note is particularly relevant to the case before us:

> We note that this is in keeping with the standard employed by many other jurisdictions. *See, e.g., Bedingfield v. Commonwealth*, 260 S.W.3d 805, 814-15 (Ky. 2008) (determining that DNA evidence that would "probably" produce a different result was sufficient to warrant a new trial, and need not explicitly exculpate the petitioner); *People v. Jackson*, 283 N.W.2d 648, 650 (Mich. Ct. App. 1979) (employing standard of whether new testing could make a different result "possible" on retrial); *Brewer v. State*, 819 So.2d 1169, 1173 (Miss. 2002) (citation omitted) (stating that standard is whether DNA evidence will "probably produce a different result"); *Commonwealth v. Reese*, 663 A.2d 206, 209 (Pa. Super. Ct. 1995) (quoting statutory standard that DNA evidence must "have affected the outcome of the trial"); *State v. Hicks*, 549 N.W.2d 435, 439 (Wis. 1996) (explaining that different result at trial not necessary if the court concludes that the "real controversy" was not fully tried); *In re Bradford*, 165 P.3d 31, 33-34 (Wash. Ct. App. 2007) (using "will probably change the result of the trial" standard in evaluating DNA evidence).

*Thompson*, 411 Md. at 684 n. 10, 985 A.2d at 43 n. 10. Although we were concerned, *inter alia*, with the "new trial" provision set forth in Section 8-201(c) (2009), the decision in *Thompson* informs our analysis of the sum and substance of the term "exculpatory" and its place in a remedial statute.

In *Bedingfield v. Commonwealth*, 260 S.W.3d 805 (Ky. 2008), cited with approval in *Thompson*, the Supreme Court of Kentucky ruled that the defendant was entitled to a

18

new trial on a rape charge after newly discovered DNA test results ruled out the presence of his DNA in sperm recovered from the victim's rape kit. After surveying decisions from other jurisdictions on the issue, the Kentucky high court elaborated:

> It would seem that this Court has never thoroughly examined the exculpatory effect of newly discovered DNA evidence in this context. However, many of our sister jurisdictions, acknowledging the accuracy, effectiveness, and implicit interests of justice inherent in DNA testing have recognized the exculpatory effect that such evidence may have in post-conviction criminal proceedings.

*Bedingfield*, 260 S.W.3d at 811. In securing Bedingfield's conviction, the prosecutor had emphasized that semen analyzed from the rape kit was crucial proof of Bedingfield's identity. A police lab technician, who could not prove Bedingfield as the source of the semen, nevertheless prompted the "supposition" that he was in any event the perpetrator. The lab technician's analysis buttressed an already suspect circumstantial evidence case, which would have been undermined by the precision of the later DNA test results. The Kentucky Supreme Court's conclusion as to the clarifying impact of the DNA testing merits quotation at length:

> Ultimately, the substantive exculpatory nature of the newly discovered DNA evidence coupled with the blatant testimonial inconsistencies of the material witnesses and the substantial impact which this newly discovered evidence has upon said testimony, along with the fact that this evidence would probably induce a different conclusion by a jury, all serve to warrant a new trial to avoid a substantial miscarriage of justice.
>
> * * *
>
> For clarity's sake we emphasize: the presence of sperm which DNA testing proves did not belong to Appellant *does not exonerate him; however, the presence of this new evidence does cast a long shadow and assuredly merits consideration in the form a new trial*. It cannot be overlooked that in Appellant's initial trial, all other arguments were enhanced and corroborated

19

by the supposition that the sperm found belonged to Appellant. Indeed, this theme was central to the Commonwealth's prosecution. Because the technology was not available for Appellant to refute that claim, Appellant was left to rely on his word against that of the Commonwealth. This new evidence is substantial, if not pivotal, and we are inclined to believe that it is precisely the type of evidence that is envisioned by the rule and that may change the result if a new trial were granted.

*Bedingfield*, 260 S.W.3d at 814–15 (emphasis added) (statutory citation omitted).

The *Bedingfield* Court's analysis of the "exculpatory effect" of the DNA evidence applies with substantial force to our inquiry into the proper assessment of the term "exculpate" as written in our statute.

The Kansas Supreme Court's opinion in *State v. Hernandez*, 366 P.3d 200 (Kan. 2016), also helps to inform our analysis. Hernandez was convicted of raping and sodomizing his daughter. *Hernandez*, 366 P.3d at 202. At trial, evidence showed that the assaults took place on the victim's bed and on the petitioner's bed. *Id.* Evidence also showed that the petitioner sometimes used condoms and sometimes did not. *Id.* During the investigation of the crime, police recovered a sheet from the victim's bed and bedding from the petitioner's bed, but neither item of evidence was tested for DNA at that time. *Hernandez*, 366 P.3d at 203. After his conviction, the petitioner filed a petition seeking DNA testing of the sheets and bedding. *Id.* Kansas's post-conviction DNA testing statute is similarly worded to our own, and provides that "[a] court shall order DNA testing pursuant to a petition made under subsection (a) upon a determination that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced." KAN. STAT. ANN. § 21-2512;

20

*Hernandez*, 366 P.3d at 204. The trial court denied his petition and petitioner appealed to the Kansas Supreme Court. *Hernandez,* 366 P.3d at 203.

The prosecution argued that the absence of Hernandez's DNA on the evidence "would not have changed the verdict." *Hernandez,* 366 P.3d at 206. In rejecting the state's argument, the Kansas high court defined exculpatory as evidence that "tends to disprove a fact in issue which is material to guilt or punishment." *Id.* The court noted that evidence can be exculpatory without being exonerating and that "[t]o be exculpatory evidence, it need not definitively prove the petitioner's innocence but only *tend to disprove* a disputed *material fact*." *Hernandez,* 366 P.3d at 208 (emphasis added). The *Hernandez* court's interpretation of the term "exculpatory" applies with equal force to the case before us. This is consistent with the interpretation of this term by our intermediate appellate court. *See Jackson v. State*, 207 Md. App. 336, 357, 52 A.3d 980, 992 ("[E]xculpatory evidence is that which is capable of clearing or tending to clear the accused of guilt.") (citations and internal quotation marks omitted), *cert. denied*, 429 Md. 530, 56 A.3d 1242 (2012).

We thus hold that "exculpatory" under § 8-201(d)(1) means evidence that would tend to clear the accused of guilt, or tend to establish his or her innocence. We further hold that "exculpatory" under this provision does not require a petitioner to establish that the result would have been different if the DNA results sought were known at the time of the trial. Accordingly, we hold that the hearing judge erroneously applied the wrong standard when she ruled that there was "no possibility that a DNA test performed on the items requested *would exonerate* [Appellant]."

Recently, in *Wallace v. State*, this Court had the occasion to address the definition

21

of "scientific identification evidence" for purposes of the evidence retention provisions of the Postconviction DNA testing statute. *See* Crim. Proc. §§ 8-201(a)(5), 8-201(j). In that case, we examined the different thresholds that a petitioner must satisfy in showing the State's duty to preserve certain evidence, Crim. Proc. § 8-201(j), and in demonstrating entitlement to DNA testing, Crim. Proc. § 8-201(d). *Wallace*, ___ Md. at ___, ___ A.3d at ___, 2017 WL 1422828 *7.

We concluded in *Wallace* that the correct legal standard for holding the State to the obligation to preserve evidence was not stringent:

> The threshold that a petitioner must satisfy in order to show that the State had a duty to preserve certain evidence under the Postconviction DNA Testing Statute is lower than the threshold that a petitioner must satisfy in order to be entitled to DNA testing on that evidence. In other words, evidence that satisfies the "reasonable probability" standard of subsection (d), and is therefore subject to DNA testing, is a subcategory of evidence that satisfies the definition of "scientific identification evidence" in subsection (a), and is therefore subject to the State's duty of preservation. "Scientific identification evidence" includes all evidence that "contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing."

*Wallace*, ___ Md. at ___, ___ A.3d at ___, 2017 WL 1422828, at *7 (footnote omitted).

We went on to hold in *Wallace* that the T-shirt in question did not qualify as "scientific identification evidence" because there was "no possibility, or chance, that DNA testing could have produced exculpatory or mitigating evidence. *Wallace*, ___ Md. at ___, ___ A.3d at ___, 2017 WL 1422828, at *9. By contrast, the articles described by Ms. K. in the case before us, particularly the cigarette lighter, were not merely random items that

22

would be the subject of a "fishing expedition," but potentially relevant material that may satisfy the slightly higher threshold for demonstrating entitlement to DNA testing.

The State argues that the absence of Appellant's DNA on the lighter does not "prove" he was not the assailant because Appellant "was charged with sexual assault; he was not charged with touching a lighter" and that "[a]ny assessment of the exculpatory value of lighter-related evidence must be understood in that context—the lighter (unlike, say, the murder weapon in *Gregg*) was of *marginal relevance*." (emphasis added). This contention confuses the concept of exculpatory evidence. The fact that the jurors were informed, even repeatedly, that there was no forensic evidence linking Appellant with the incident, does not detract from the fact that DNA testing might rule out the presence of Appellant's DNA on the items tested.

The State posits that our decision in *Brown v. State*, 431 Md. 576, 66 A.3d 675 (2013), is apposite. In that case we held that DNA test results showing an absence of the defendant's DNA on an assault weapon "did not contradict or undercut any information presented to the jury at trial." *Brown*, 431 Md. at 589, 66 A.3d at 683. In denying *Brown's* motion for a new trial, the post-conviction court in that case determined that negative results from DNA testing did not undermine the prosecution's case, because the jury heard, at length, evidence that there was no forensic evidence linking Brown to the crime. We affirmed.

We explained that, in the context of a motion for a new trial, the post-conviction court "did not abuse its discretion in finding that the absence of Brown's DNA on [the

23

evidence in question] did not provide a substantial possibility that the jury would have reached a different conclusion with respect to Brown's guilt." *Brown*, 431 Md. at 589, 66 A.3d at 683. The distinction between *Brown* and the case before us is that Brown's petition was evaluated in the context of a motion for a new trial and the evidence of trial was such that the post-conviction court was satisfied that, in light of the DNA evidence, Brown failed to demonstrate a "substantial possibility that he would not have been found guilty if the DNA evidence had been introduced at trial," while the post-conviction court in the case applied an incorrect legal standard. 431 Md. at 590, 66 A.3d at 683-84.

The State further posits that the absence of trace evidence only proves that there was no trace evidence. The State claims that DNA cannot establish a negative, meaning that although the presence of Appellant's DNA on the lighter would tend to establish he was the perpetrator, the absence of his DNA would not tend to establish that he was not the perpetrator; the absence of a DNA match effectively proves nothing, according to the State.

The absence of Appellant's DNA has the potential to exculpate Appellant to the extent that it would tend to prove that he either did or did not use the lighter that Ms. K. testified was used by the man who assaulted her. Where criminal agency is an issue, such as in this case, evidence tending to prove or disprove that the accused's DNA is present on items that the perpetrator touched or may have come into contact with has a great potential to exculpate. Thus, the State's attempt to distinguish *Gregg* on the basis that the item to be tested in that case was the instrument of the crime, is not dispositive with respect to all

24

cases of DNA testing.[15]  Although the absence of Appellant's DNA on the lighter would

not *conclusively* prove that Appellant did not assault Ms. K., as the attacker may not have

transferred any trace DNA to the lighter, absolute certainty is not the standard.

In assessing whether there is a reasonable probability that DNA testing may produce

exculpatory or mitigating evidence, where the State has possession of an item that a

perpetrator allegedly touched, a court may take into account factors such as the nature of

the item (e.g., whether it is an instrumentality of the crime), the physical proximity between

where the item was located and where the crime occurred, and the temporal proximity

between when the perpetrator touched the item and when the crime occurred.  Applying

these factors to the instant case, we conclude that Appellant has established that DNA

testing is warranted as to the cigarette lighter.  Although the cigarette lighter is not an

instrumentality of the crime, the physical proximity between where the lighter was located

and where the crime occurred and the temporal proximity between when the perpetrator

touched the lighter and when the crime occurred are factors that weigh heavily in favor of

granting Appellant's request.  The perpetrator gained access to Ms. K.'s vehicle by asking

---

[15] This is only true with respect to the cigarette lighter.  Under our interpretation of the DNA statute, Appellant would not be entitled to testing of the Forever 21 bag and the cigarette pack.  Appellant's contention that the perpetrator "could have" transferred epithelial cells due to his "proximity" to these items speaks to a mere *possibility* and is insufficient to satisfy the *reasonable probability* standard.  These items were items that the perpetrator could have *possibly* or *conceivably* come into contact with, but the trial record in this case contains no evidence that the perpetrator actually did come into contact with these items. Unlike the cigarette lighter in this case, the absence of Appellant's DNA on these items would not tend to establish that he was not the perpetrator of this crime, as the perpetrator of this crime was never alleged to or shown to have come into contact with these items.

to borrow her lighter, and the crime occurred immediately after the perpetrator touched the lighter. In sum, as discussed above, the standard is simply whether there is a reasonable probability, or fair likelihood, that the testing has the potential to produce exculpatory evidence, which in turn, is evidence that *tends* to disprove or negate a petitioner's guilt.

## CONCLUSION

The hearing judge incorrectly applied a more stringent standard that would require Appellant to show that the DNA testing he seeks would exonerate him. Given the extant record, we conclude that Appellant has established that DNA testing is warranted in light of the proper standard set forth above. Accordingly, we shall vacate the order of the hearing judge and remand the case to the Circuit Court to enter an order directing DNA testing on the cigarette lighter. Crim. Proc. § 8-201(d). *See Gregg v. State*, 409 Md. at 721, 976 A.2d at 1012 (remanding a post-conviction DNA case for circuit court to direct DNA testing). *Cf. Simms v. State*, 409 Md. at 733-34, 976 A.2d at 1019–20 (holding petition facially sufficient to warrant DNA testing; remanding for Circuit Court to direct State to respond to petition).

**JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY VACATED. CASE REMANDED TO THAT COURT WITH DIRECTION TO ISSUE AN ORDER FOR DNA TESTING CONSISTENT WITH THIS OPINION. STATE TO PAY THE COSTS.**

26