*James Patrick Beaman v. State of Maryland*, No. 67, Sept. Term 2016.  Opinion by Greene, J.

**CRIMINAL JUSTICE—POST-CONVICTION DNA TESTING**

Under § 8-201 of the Criminal Procedure Article, persons convicted of crimes of violence are entitled to post-conviction DNA testing upon a showing that "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing and the requested DNA test employs a method of testing generally accepted within the relevant scientific community."  Exculpatory evidence is evidence that tends to establish the innocence of the petitioner.  The statute does not require a petitioner to show that the outcome of his or her case necessarily would have been different, had the jury been presented with the evidence the petitioner seeks to obtain through the requested DNA testing.  The Circuit Court applied the incorrect legal standard in ruling that there was not a "substantial possibility" that DNA testing of the requested items would "change the verdict."

**CRIMINAL JUSTICE—POST-CONVICTION DNA TESTING—EXCULPATORY EVIDENCE**

Appellant asserts that DNA testing of blood evidence, found on the patio under a broken window from which the victim jumped, would show that the blood belonged to the victim, which in turn, would establish that an eyewitness misidentified Appellant.  Section § 8-201(d) requires a *reasonable probability* that the testing has the scientific potential to exculpate a petitioner, which rises above a mere *possibility*.  There is no reasonable probability that the testing of the blood found on the patio would have the scientific potential to produce exculpatory or mitigating evidence.  Testing blood, found at a location where a victim landed after being shot and jumping out of a fourth-story window, to show that the blood belonged to the victim does not logically suggest that an eyewitness misidentified Appellant.  For these reasons, the Circuit Court's denial of Appellant's petition is affirmed.

Circuit Court for Prince George's County
Case No. CT900270B
Argued: May 5, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 67

September Term, 2016

_____

JAMES PATRICK BEAMAN

v.

STATE OF MARYLAND

_____

Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,
Rodowsky, Lawrence F., (Senior Judge,
Specially Assigned)

JJ.

_____

Opinion by Greene, J.

_____

Filed: June 21, 2017

This case involves a direct appeal under the Post-conviction DNA Testing Statute, Md. Code (2001, 2008 Repl. Vol., 2016 Supp.), § 8-201 of the Criminal Procedure Article ("CRIM. PROC."). James Patrick Beaman ("Appellant") seeks review of the denial by the Circuit Court for Prince George's County of his Petition for Post-conviction DNA Testing.

## BACKGROUND

### Procedural History

On February 2, 1990, Appellant was charged in the Circuit Court for Prince George's County with four counts of first-degree murder, four counts of using a handgun in the commission of a crime of violence, and conspiracy to commit first-degree murder. After a jury trial between April 18, 1990 and April 21, 1990, the jury convicted Appellant of all counts. On September 13, 1990, Appellant was sentenced to four consecutive terms of life without the possibility of parole, and four concurrent terms of twenty years. Appellant noted an appeal on September 19, 1991, and the intermediate appellate court affirmed the convictions and sentences.

Appellant subsequently filed several post-conviction petitions. Appellant filed the instant *pro se* Petition for DNA Testing of Scientific Evidence in the Circuit Court for Prince George's County on August 30, 2012. A hearing on the Petition was held on March 17, 2016. On October 20, 2016, the Circuit Court issued an order denying Appellant's

Petition. On November 2, 2016, Appellant filed a notice of direct appeal to this Court pursuant to § 8-201(k)(6).[1]

## Facts

In the early morning hours of November 7, 1989, police responded to the scene of 6439 Hil-Mar Drive, an apartment residence in Prince George's County, after receiving a call for shots fired. Police found four men—Terrance Stephenson, Edmond Stephenson, Robert Morton, and Abraham Williams—murdered as a result of gunshot wounds. The body of Abraham Williams was found inside the fourth-floor apartment unit in front of the door. Police discovered a broken window in one of the bedrooms, through which it appeared someone had jumped. Officers found a second body in the hallway of the living room, and a third body in the den area of the apartment. The three men in the apartment each had a gunshot wound to the head. Police found a fourth body, that of Edmond Stephenson, at the side of the apartment building.

The State's theory of the case was that the victims, who were living in the apartment together, were killed by Appellant and Ervin Holton in retaliation for a dispute over turf for narcotic sales. The dispute between Appellant, Holton, and the Stephenson brothers had occurred one week prior to the murders.[2] Investigators recovered blood evidence from

---

[1] Md. Code (2001, 2008 Repl. Vol., 2016 Supp.), § 8-201(k)(6) of the Criminal Procedure Article provides that, "[a]n appeal to the court of appeals may be taken from an order entered under this section."

[2] The State maintains that there were two shooters in the Stephenson apartment because the ballistics evidence showed that two of the men were shot with a .38 and the other two with a 9mm firearm.

2

the ground-level patio, directly below the fourth-floor apartment's window, from which, the State believed, the fourth victim had jumped. The State's theory regarding the murder of the fourth victim, Edmond Stephenson, was that he jumped through the bedroom window to escape and was shot in the buttocks as he did so. The State believed that Edmond Stephenson landed on a balcony where he tried to get into that apartment to evade the shooters. Edmond Stephenson left blood on the ground of the balcony's patio as well as on a table that was on the balcony's patio. The State argued that Edmond Stephenson was then "chased, pursued like an injured animal" and ultimately shot to death by either of the two shooters as he ran around the back of the building.[3]

At trial, Doria Rogers testified as an eyewitness. Ms. Rogers and her mother lived in the same apartment complex where the murders took place. Ms. Rogers knew the deceased residents of the apartment. Ms. Rogers testified that loud noises "like people was fighting or something" awoke her on the morning of the November 7. She testified that she got up and ran to the balcony and saw "two boys running past." One was light-skinned and wore a white jacket with blue windbreaker pants and was carrying a gun. The other was dark-skinned and wore a black coat. Ms. Rogers described the men as being "together." Ms. Rogers testified that the light-skinned man was in front and the dark-

---

[3] The State believed the two shooters ran out of the apartment after Edmond jumped out of the window. A witness, Hattie Tharps testified that she heard running footsteps down the stairs after hearing shots in the apartment next to hers.

skinned man was behind him.[4]   Both men were about the same height and the dark-skinned

man had a "big nose and a little bit of hair on his mustache."  Ms. Rogers testified that she

watched until the men disappeared from her sight.  Once she returned inside the apartment,

she heard gunshots.

On the day following the murders, Ms. Rogers saw the same two men walking by

the apartment building.  She testified that the dark-skinned man was wearing the same

pants he wore the previous night and the light-skinned man was wearing the same coat he

wore the previous night.  The police showed Ms. Rogers photographic arrays and she

identified Appellant and Ervin Holton as the two men she saw running from the scene the

morning of the murders.

At trial, the State conceded that it could not ascertain which of the two suspects shot

which victim, but the State argued that Appellant at least bore accomplice liability in all

four shootings.   Defense counsel explained to the jury during closing arguments

Appellant's theory of misidentification:

> [Mr. Ferguson[5]] was specifically inquired of as to whether there were one
> person or two persons who ran behind that building.  He said there was one
> person.   This evidence was established primarily through the direct
> examination of the [S]tate, but the [S]tate doesn't mention this evidence to
> you, and why not?  Because if you consider this evidence and you consider
> the credibility, and you are the judges of the credibility of the witnesses, if
> you consider the credibility of Mr. Ferguson, who is a middle-aged

---

[4] This testimony was apparently inconsistent with an earlier statement Ms. Rogers made to police, in which she said that the dark-skinned man was in front, followed by the light-skinned man.

[5] William Ferguson was a witness who lived in one of the nearby apartments and testified that he looked outside of his window after hearing gunshots.

gentleman who is living across the court who knows none of the people involved here who testified to you directly, looked right at you, told you that that is what he saw, that there were no obstructions, and you consider that evidence together with what Doria Rogers tells you that she saw, you must reach the inescapable conclusion that the second person that she saw from inside of her apartment looking out across the balcony and her limited field of vision, and there is an exhibit which demonstrates that where she was asked to make some marks …the conclusion is that the dark-skinned person that she saw ahead of the light[-]skinned person was a person who ended up dead at the corner of 6437, Edmond Stephenson.

What she saw in those two seconds was Edmond Stephenson running for his life and a gentleman in a white coat and white hood with a gun she said she saw that individual with a gun chasing after him.

As previously stated, the jury found Appellant guilty of all counts.[6]

## Post-conviction Proceedings

In Appellant's *pro se* Petition, he sought DNA testing of the blood-evidence found on the first-floor patio. The Circuit Court held a hearing on March 17, 2016 regarding Appellant's post-conviction petition. At the hearing, Appellant, representing himself, stated in a colloquy with the hearing judge why he believed that DNA testing of the blood was appropriate:

THE COURT:     Because there was some confusion by Ms. Rogers with respect to this dark-skinned man versus light-skinned man, right?

[APPELLANT]:     Exactly.

THE COURT:     And the order they were moving in.

[APPELLANT]:     Yes, Your Honor. Yes.

THE COURT:     Okay. And why would that information have some mitigation or exculpatory effect on your case?

---

[6] The State tried Appellant separately from Ervin Holton.

5

[APPELLANT]:      It would show that she misidentified me as being the victim. And also, Your Honor –

THE COURT:      She misidentified you as being the victim?

[APPELLANT]:      She identified me as being the dark-skinned man. And I'm trying to say it was not me, it was Mr. Edward Stevenson [sic] that she seen running when (inaudible). Also I'd like to say that in my trial, on page, I believe it's 420, the trial judge told the jury that if you believe her identification, then it was enough to convict me. She also gave a second identification saying the next day or two days later, she seen the same two men that she seen out back of her apartment, in front of her apartment two days later. She gave the jury reason to believe that she did see me. But the blood tests will show that it was the victim that she seen and it would have been impossible for her to see the same two men, because the victim, Edward Stevenson [sic] was deceased.

* * *

[APPELLANT]:      It could establish that the dark-skinned man was somebody else other than myself. That's what I'm claiming . . . I'm saying that the dark-skinned person that was seen running underneath the (inaudible) was the victim. I'm saying if I could have that blood tested, I could establish by showing a jury that it was the victim that she seen underneath (inaudible), not the defendant.

The Circuit Court issued a written order denying Appellant's petition. In doing so, the court ruled:

> [Mr. Beaman] was charged with four counts of first degree murder. Murder is a crime of violence as detailed in § 14-101 of the Criminal Law Article, thus it is the Petitioner's right to request for DNA testing of scientific identification evidence the State possesses related to the judgment of conviction.
>
> [Mr. Beaman] contends that the State's eyewitness Doria Rogers testified at Grand Jury that a dark-skinned man was in the front. [Mr. Beaman] continues to explain that on June 20, 1990, Doria Rogers testified in trial that the dark-skinned man was second. [Mr. Beaman] states that on

6

August 8, 1990,[7] State's witness Doria Rogers testified that the dark-skinned person was in front and the light[-]skinned person was in the back, and then she recanted her testimony. Because of this, [Mr. Beaman] claims that the State knowingly used false evidence to obtain a conviction. [Mr. Beaman] explains that the jury determines the truthfulness and or the falsity of the evidence and had no reason to believe that the red fluid substance was relevant to the identity of the dark-skinned person. [Mr. Beaman] claims that the DNA test is relevant to the true identity of the dark-skinned person seen running underneath and past the balcony area. [Mr. Beaman] continues to claim that there was no eyewitness testimony or evidence introduced at his trial that identified the victim Edmond Stephenson as the dark-skinned person running to or from the patio area. [Mr. Beaman] requests a search of, but not limited to, the Prince George's County Police Department's Forensic Science Division and other law enforcement agencies or databases or logs used for the purpose of identifying the source of the physical evidence used for DNA testing.

The State argues that [Mr. Beaman] is seeking to prove what was already presented at trial, that the donor of the blood found on or about the patio area belonged to the victim Edmund Stephenson, and thus the petition should be denied as DNA testing would not produce mitigating or exculpatory evidence relevant to a claim of wrongful conviction or sentencing. The [c]ourt agrees. In this instance, it is not reasonable to believe that simply testing blood found at the crime scene would prove [Mr. Beaman's] innocence, especially since the State never presented an argument that the blood belonged to [Mr. Beaman]. The Victim was found shot several times, and therefore it is reasonable to believe his blood would be found at the scene. Since there is not a substantial probability that testing DNA would have changed the verdict, the request is denied.

## DISCUSSION
### Standard of Review

Because we must interpret CRIM. PROC. § 8-201 and determine whether the hearing court applied the correct legal standard when it denied Appellant's petition, our review is

---

[7] In his response to the State's answer to his petition, Appellant refers to Ms. Rogers' August 8, 1990 testimony at the trial of Ervin Holton.

*de novo*.  *Edwards v. State*, __ Md. __,  __ A.2d __, Slip Op. 9 (2017).  *See also Fuster v. State*, 437 Md. 653, 671, 89 A.3d 1114, 1124 (2014) ("An appellate court reviews without deference the legal standard that a trial court uses in ruling on a petition.").

## Parties' Contentions

Appellant maintains that the Circuit Court erroneously denied his petition for post-conviction DNA testing because in reaching its conclusion, the court applied the incorrect standard of law.  Appellant argues that the standard is whether there is a *reasonable probability* that DNA testing has the scientific *potential* to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing.  Appellant contends that the Circuit Court applied a more stringent standard when it ruled that DNA testing would not "prove" Appellant's "innocence" and that there was not a "substantial probability" that DNA testing would have "changed the verdict."

The State argues that even if the outcome of the requested testing is as Appellant desires, such would not produce exculpatory or mitigating evidence.  The State contends that if DNA testing showed that the blood belonged to the victim, this would be consistent with the State's theory at trial that the victim jumped out of the window after being shot in the buttocks in an attempt to flee from the shooters, but that the shooters chased after the victim and shot him fatally outside the apartment.  The State notes that it argued at trial that the blood on the ground was that of the victim, and that it never argued that the blood belonged to the assailant.

## CRIM. PROC. § 8-201

We recently discussed generally our Post-conviction DNA testing statute in

8

*Edwards v. State*:

Maryland's post-conviction DNA testing statute, which was enacted by the General Assembly in 2001, is codified at § 8-201 of the Criminal Procedure Article. "Section 8-201 entitles persons convicted of certain serious crimes to pursue DNA testing of physical evidence that is in the possession of the State and might produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing." *Simms v. State*, 409 Md. 722, 727, 976 A.2d 1012, 1015–16 (2009). *See also* Md. Rule 4-703(2)(A).

The statute was enacted "in line with a nationwide trend to adopt post-conviction DNA testing statutes designed to provide an avenue for the exoneration of the actually innocent." *Blake v. State*, 395 Md. 213, 219, 909 A.2d 1020, 1023 (2006). We have stated that the purpose of CRIM. PROC. § 8-201 is to "facilitate the establishment of claims of actual innocence for serious crimes." *Thompson v. State*, 395 Md. 240, 252, 909 A.2d 1035, 1042 (2006).

Under CRIM. PROC. § 8-201, persons convicted of certain crimes of violence may file a petition requesting "DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction." CRIM. PROC. § 8-201(b)(1). "Scientific identification evidence" is defined in § 8-201(a)(5) as evidence that

> (i) is related to an investigation or prosecution that resulted in a judgment of conviction;
>
> (ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and
>
> (iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

CRIM. PROC. § 8-201(a)(5). "Biological evidence" is defined as evidence that "includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained." CRIM. PROC. § 8-201(a)(2). The statute mandates that a court grant a petition for DNA testing if the court finds:

> (i) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or

9

sentencing; and

(ii) the requested DNA test employs a method of testing generally accepted with in the relevant scientific community.

CRIM. PROC. § 8-201(d)(1).

*Edwards*, __ Md. __, __ A.3d __, Slip Op. 11–15 (footnotes omitted). The parties have not raised as an issue on appeal Appellant's compliance with the scientific testing requirements of § 8-201(d)(1)(ii), thus our concern is focused on the requirements of § 8-201(d)(1)(i).

In *Edwards*, we defined the term "exculpatory" under § 8-201(d)(1) as meaning "evidence that would tend to clear the accused of guilt, or tend to establish his or her innocence." __ Md. __, __ A.3d __, Slip Op. 21. We further explained that "'exculpatory' under this provision does not require a petitioner to establish that the [outcome] would have been different if the DNA results sought were known at the time of the trial." *Id.* There, we held that the hearing judge applied the incorrect standard of law in denying Mr. Edward's petition for post-conviction DNA testing where the judge ruled that there was "no possibility that a DNA test performed on the items requested *would exonerate*" Mr. Edwards. *Id.*

Here, the hearing judge's ruling included language that "it is not reasonable to believe that simply testing blood found at the crime scene would *prove* [*Mr. Beaman's*] *innocence*[.]" (emphasis added). Further, the hearing judge concluded "Since there is *not a substantial possibility* that testing DNA *would have changed the verdict*, the request is denied." (emphasis added). Applying *Edwards*, we hold that the hearing judge applied the

10

wrong standard of law in denying Appellant's petition.  By invoking language suggesting that a petitioner must show that the DNA results would *prove* his or her innocence or that the result would have been different had the DNA results been known at the time of the conviction, the hearing judge applied a standard of law more stringent than § 8-201(d)(1) requires.

Furthermore, in concluding that "there is *not a substantial possibility* that testing DNA *would have changed the verdict*," the hearing judge ostensibly relied on the more rigorous standard used to determine whether a petitioner is entitled to a new trial under § 8-201(c).  Recently, in *Wallace v. State*, we explained:

> If the petitioner moves for a new trial "on the grounds that the conviction was based on unreliable scientific evidence," then the court must determine whether a "**substantial possibility** exists that the petitioner would not have been convicted without the evidence." CP § 8-201(c) (emphasis added). Similarly, "[i]f the results of the postconviction DNA testing are favorable to the petitioner," then the court must find "that a **substantial possibility** exists that the petitioner would not have been convicted if the DNA testing results had been known or introduced at trial" before ordering a new trial.  CP § 8-201(i)(2)(iii) (emphasis added).
>
> Because this *"substantial possibility" standard relates to whether the outcome of the petitioner's trial would have been different, it is a higher threshold than the "reasonable probability" standard, which relates only to whether the DNA testing has the potential to produce exculpatory or mitigating evidence, not what the effect of that evidence would have been at trial*.

*Wallace v. State*, __ Md. __,  __ A.3d __, Slip Op. 16, n. 8 (2017) (emphasis in italics added).  Accordingly, we hold that the hearing court erred in applying the incorrect standard of law when denying the petition.  We shall now evaluate Appellant's petition under the correct standard of law as set forth in *Edwards*.

11

In *Edwards*, we held that under the correct standard of law, Mr. Edwards was entitled to DNA testing of a cigarette lighter, and we ordered that such testing be performed. *Edwards*, __ Md. __, __ A.3d __, Slip Op. 26. The pertinent facts of that case were that Mr. Edwards was convicted of attempted rape and assault of the victim, Ms. K. *Edwards*, __ Md. __, __ A.3d __, Slip Op 1. In his post-conviction petition for DNA testing, Mr. Edwards sought DNA testing of a cigarette lighter, a plastic Forever 21 bag, and a cigarette pack. *Edwards*, __ Md. __, __ A.3d __, Slip Op. 1. At trial Ms. K. testified that her attacker used her cigarette lighter and that he sat in the passenger seat of her vehicle (in close proximity to the bag and the cigarette pack). *Edwards*, __ Md. __, __ A.3d __, Slip Op. 3.

We held that there was a reasonable probability that DNA testing of the lighter had the scientific potential to produce exculpatory or mitigating evidence because the attacker was alleged to have come into direct contact with the lighter, and the absence of Mr. Edwards' DNA on the lighter would tend to suggest that he was not the man who assaulted her. *Edwards*, __ Md. __, __ A.3d __, Slip Op. 24. ("The absence of [Mr. Edwards'] DNA has the potential to exculpate [him] to the extent that it would tend to prove that he either did or did not use the lighter that Ms. K testified was used by the man who assaulted her. Where criminal agency is an issue, such as in this case, evidence tending to prove or disprove that the accused's DNA is present on items that the perpetrator touched or may have come into contact with has a great potential to exculpate."). We limited our holding to the DNA testing of the lighter because the bag and the cigarette pack

12

were items that the perpetrator could have *possibly* or *conceivably* come into contact with, but the trial record in th[e] case contains no evidence that the perpetrator actually did come into contact with these items. Unlike the cigarette lighter . . . the absence of [Mr. Edwards'] DNA on these items would not tend to establish that he was not the perpetrator of this crime, as the perpetrator of this crime was never alleged to or shown to have come into contact with these items.

*Edwards*, __ Md. __, __ A.3d __, Slip Op. 25, n. 15.

In the case before us, Appellant's argument for DNA testing is comparatively weaker than the argument made by Mr. Edwards in *Edwards*. Here, Appellant argues that he was misidentified as the dark-skinned man who Ms. Rogers saw running from the apartment before she heard gunshots. He argues that the man Ms. Rogers saw was in fact the victim, Edmond Stephenson. Appellant wishes to support this contention by testing the DNA of blood evidence found on the patio where the victim, injured with a non-fatal gunshot wound to the buttocks, landed after jumping from the apartment window. Appellant's desired-for outcome is that said DNA testing will show the blood belonged to the victim.

In *Wallace*, we explained that the "reasonable probability" standard of § 8-201(d) requires a showing of "a fair likelihood that something is true." *Wallace*, __ Md. at *8, __ A.3d __ (citation omitted). We also explained that the *reasonable probability* standard requires showing more than a mere *possibility*. *Id.* Even if Appellant were to achieve his desired result of the DNA testing, it would in no way tend to establish that Ms. Rogers saw the victim and not the Appellant. The State argued at trial that the blood came from the victim. There was never any argument or suggestion that the blood came from the perpetrator of the crime. That a gunshot victim who jumps from a window might leave

13

behind blood is obvious. That the blood belongs to the victim does not tend to suggest that Ms. Rogers saw one perpetrator chasing a victim, as opposed to seeing two perpetrators chasing a victim that had already run past Ms. Rogers' line of vision. In other words, there is not a "fair likelihood" that DNA testing of the blood would produce evidence that would "tend to establish [Appellant's] innocence." *Wallace*, __ Md. at *8, __ A.3d __; __ Md. __, __ A.3d __, Slip Op. 21.

In *Edwards*, there was a connection between the item on which testing was sought and the contention the petitioner wished to support—the evidence showed that the perpetrator touched the lighter, and by showing that his DNA was not on the lighter, Mr. Edwards sought to support the conclusion that he was not the perpetrator. Here, there is no such connection. The evidence in this case showed that the blood came from the victim. Appellant wishes to have testing performed to show that his DNA is not in the blood found on the patio to support the contention that he was falsely identified by an eyewitness. That the blood may belong to the victim would not logically support the conclusion that Ms. Rogers saw the victim and not Appellant. We thus hold that there is no reasonable probability that the testing of the blood found on the patio would have the scientific potential to produce exculpatory or mitigating evidence. Accordingly, we hold that the arguments presented by Appellant in his petition and at the hearing on the petition utterly fail to satisfy the requirements of § 8-201. *See Wallace*, __ Md. at *8, __ A.3d __ ("Therefore, '[e]stablishing a possibility requires a lower quantum of proof or evidence (the showing of a chance, not necessarily a fair likelihood) than establishing a reasonable probability. In that regard, a 'reasonable probability' is a higher standard than a

14

possibility.'") (citations omitted).  In this respect, we shall affirm the ruling of the hearing court.

Finally, with respect to the ultimate disposition of this case, we must determine whether or not we should remand for further proceedings.  In *Edwards*, we recognized that "[t]he Post-conviction Court effectively denied Appellant's Petition as a matter of law." *Edwards*, __ Md. __,  __ A.3d __, Slip Op. 10.  There we held that the hearing judge applied the incorrect standard of law and we did not remand the case for further proceedings.  Because we determined that the petition satisfied the requirements of § 8-201, we applied *Gregg v. State*, 409 Md. 698, 721, 976 A.2d 999, 1012 (2009)[8], and remanded the case with directions for the Circuit Court to order testing.  *Edwards*, __ Md. __,  __ A.2d __, Slip Op. 26.

The difference between this case and the cases of *Gregg* and *Edwards* is that the petition and Appellant's assertions in this case do not come close to satisfying the standard under § 8-201 for ordering DNA testing.  We conclude that Appellant is not entitled to testing under the statute.  Notwithstanding the fact that the hearing court confounded the applicable standards in its ruling, there is no reason to remand this case for further proceedings because of the obvious futility of Appellant's assertions.  *See Jackson v. State*, 448 Md. 387, 411, 139 A.3d 976, 990 (2016) ("[W]e determine that Jackson's 2015 Petition was properly denied without a hearing by the Circuit Court, albeit without [it] including

---

[8] In *Gregg*, the hearing judge applied the incorrect standard of law in summarily denying the petitioner's petition for DNA testing, but because we found the petition to satisfy § 8-201, we remanded the case with directions to order the testing.

factual findings; *we choose not to remand for inclusion of further findings, however, because of the obvious futility of Jackson's assertions.*") (emphasis added).

## CONCLUSION

For the foregoing reasons, we shall affirm the judgment of the Circuit Court for Prince George's County.

> **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**