*Albert Gustav Givens v. State of Maryland*, No. 31, September Term, 2017, Opinion by Adkins, J.

**CRIMINAL JUSTICE — CRIMINAL PROCEDURE ARTICLE § 8-201 — POST-CONVICTION DNA TESTING:** Under Maryland Code (2001, 2008 Repl. Vol., 2017 Supp.), § 8-201(d)(1) of the Criminal Procedure Article, a court must grant a petition for DNA testing upon finding that a reasonable probability exists that the DNA testing has scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing and that the requested DNA test employs a method that is generally accepted in the relevant scientific community. Appellant, serving a sentence of life without parole for first-degree murder, could not satisfy the burden of demonstrating that there was a reasonable probability that the results produced would be exculpatory or mitigating.

Circuit Court for Anne Arundel County
Case No.: 02-K-92-002270
Argued: May 7, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 31

September Term, 2017

ALBERT GUSTAV GIVENS

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.

Filed: July 12, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

Albert Gustav Givens was convicted of first-degree murder and sentenced to life without parole. Givens appeals from a ruling by the Circuit Court for Anne Arundel County denying post-conviction DNA testing under Maryland Code (2001, 2008 Repl. Vol., 2017 Supp.), § 8-201 of the Criminal Procedure Article ("CP").[1] We affirm the post-conviction court's denial of Givens's motion because the court did not err when it concluded that there was no reasonable probability that DNA testing could produce exculpatory or mitigating evidence.

## FACTS AND LEGAL PROCEEDINGS

Givens was first convicted of the murder of Marlene Kilpatrick in 1993.[2] After filing for post-conviction relief, Givens was granted a new trial in 1999. His second trial in 2003 ended in a mistrial after the jury could not reach a unanimous verdict. Givens was tried for a third time in 2004, and the Court of Special Appeals reversed his conviction due to evidentiary errors.[3] Givens's fourth trial began in 2006 but ended in a mistrial shortly after the first witness began her testimony. Givens's fifth trial, the primary subject of this appeal, took place in 2006.

---

[1] The General Assembly has amended this statute. The amendments are not relevant to this case. *See* Md. Code (2001, 2008 Repl. Vol. 2017 Supp.), § 8-201 of the Criminal Procedure ("CP") Article, *amended by* 2018 Md. Laws, ch. 602.

[2] Givens had been charged with first, second, and third-degree sexual offenses, robbery with a deadly weapon, robbery, and felony theft, but was acquitted of those offenses in his 1993 trial.

[3] *See Givens v. State*, No. 88, Sept. Term 2005 (Md. Ct. Spec. App. Apr. 19, 2005).

The testimony established the following. Marlene Kilpatrick's body was discovered by her daughter, Lisa Kilpatrick O'Connell, in Kilpatrick's home in Arnold, Maryland on January 3, 1992. Kilpatrick had suffered multiple blunt force injuries to her skull, which caused multiple skull fractures and injuries to her brain. She had been stabbed three times in the torso, and a knife was embedded in one of the wounds. Fuel injection cleaner had been poured on her face and in her mouth. A Sprite bottle had been inserted into her vagina—a detail that officers withheld from the public.

There was no sign of forced entry into Kilpatrick's home, although the telephone line had been cut. A cup of coffee and a partially full bottle of Coca-Cola were found on the table. There was a substantial amount of blood in the kitchen, leading to the bedroom where Kilpatrick's body was discovered. Kilpatrick's purse, keys, daily reminder book, and car were missing from the home. Based on the circumstances of the crime, the police theorized that the killer was acquainted with Kilpatrick. They investigated a number of individuals, including Givens. Givens had become friends with the Kilpatrick family through the victim's son, Jay Kilpatrick. He had also painted and done minor repairs for the victim.

Shortly after Kilpatrick's body was discovered, police questioned Givens regarding his activities on the date of the murder. He stated that he was with his girlfriend, but after she corrected him, Givens told police that he had been drinking with a friend.

Only Kilpatrick's blood was found at the crime scene. Police recovered hair and fibers, but none matched Givens. A footprint was found outside Kilpatrick's home, but was not adequate for a plaster mold. The police were able to swab saliva from the partially

full Coca-Cola bottle on the kitchen table and sent it to Cellmark for DNA comparison and testing against samples from numerous suspects, including Givens. The initial results established that Givens could be a match to the saliva on the bottle.[4]

Kilpatrick's car was located several miles away in the parking lot of a hardware store in Severna Park. The owner of the store, Gordon Clement, had arrived at the store around 7:00 a.m. on January 2, 1993. Around 7:30 a.m., Clement observed a man in front of his store. Approximately two hours later, Clement noticed a car in his parking lot that had not been there when he arrived. The car was still there the next day. After work, Clement heard a report on the radio about Kilpatrick's murder that described her missing vehicle and included the tag number. Clement contacted the store, verified that the car in the lot matched the one described in the radio report, and the matter was reported to the police. Police showed Clement a photographic array that included a picture of Givens but Clement did not identify him at that time. Some months later, after Givens had been

---

[4] At the first trial, the State's expert witness in DNA identification, Dr. Charlotte Word, testified that Givens could be responsible for the sample on the Coca-Cola bottle, although DNA matching at that time was not as precise as it later became. After Givens received post-conviction relief in 1999, the DNA from the bottle was re-tested using more advanced methods, specifically STR (short tandem repeat) testing. The results of this testing were admitted in Givens's subsequent trials.

In these trials, the State's expert witness testified that STR testing showed that Givens's DNA matched the DNA found on the Coca-Cola bottle at each of the 13 areas of comparison. She stated that it was her opinion that, "within a reasonable degree of scientific certainty Albert Givens is the source of the DNA on the swab from the [Coca-Cola] bottle." *See Young v. State*, 388 Md. 99, 119–20 (2005). We discuss the specifics of DNA testing in greater detail *infra*.

3

arrested and charged, Clement saw his picture in the newspaper and recognized Givens as the man he had seen. Clement identified Givens at trial.

Givens was arrested in July 1993, after the DNA testing established that he was a likely match to the saliva on the Coca-Cola bottle. During police interviews after his arrest, Givens maintained that he had been with a friend the day Kilpatrick was killed. After being confronted with the DNA evidence on the Coca-Cola bottle, Givens asserted that he had seen Kilpatrick at a store in Severna Park several days before her death and gave her the bottle for disposal. Givens also made a statement about the Sprite bottle being in the victim's vagina and explained his knowledge by claiming that this fact was more widely known than the police had thought.

Upon arresting Givens and executing search warrants, the police discovered a large toolbox containing over 100 tools in Givens's car. Dr. William Vosburgh, who testified as the State's expert in forensic serology and blood stain pattern analysis, had examined the contents of the toolbox in 1992. He testified that the majority of the tools were oily and dirty, but one item, a 15-inch Sears Craftsman crescent wrench, appeared unusually clean in comparison. The State's theory, presented at all of Givens's trials, was that Givens had used the wrench to bludgeon Kilpatrick before stabbing and further assaulting her, and that Givens had cleaned the wrench after the murder. The State presented expert testimony from several witnesses to establish that the wrench was a likely murder weapon.

Vosburgh was unable to obtain any serological test results that could show with any reasonable degree of scientific certainty whether blood or human tissue had been present

on the wrench.[5]  Vosburgh swabbed the wrench and took a scraping from it and sent both samples to Cellmark for further testing.  He explained that after examining the wrench, he found no lubricant, dirt, or grime in the adjustable mechanism of the wrench, although he would have expected to find lubricant in the mechanism.  Vosburgh also testified that cleaning a surface can remove or affect blood and other serological fluids such that testing may be unable to establish if such fluids were ever present.

Dr. Charlotte Word, the State's expert in DNA identification, testified about Cellmark's attempts in 1992 to identify and test DNA on the scraping and swab.[6]  Cellmark made three attempts to extract DNA that might be in the scraping and two attempts to extract DNA that might be on the swab.  Cellmark was unable to obtain any results.  Word testified that based on the results of the test, she was unable to determine whether there was enough DNA to obtain a sample, whether the DNA was too degraded to obtain results, or whether there was any DNA present at all.

Dr. David Fowler, the Chief Medical Examiner for the State of Maryland, testified that the lacerations, abrasions, and fractures on Kilpatrick's skull were consistent with the

---

[5] In 1992, Dr. William Vosburgh used phenolphthalein, a preliminary serology testing method, on the scraping from the wrench.  He obtained a weak positive test for blood.  Vosburgh did no confirmatory tests.  Phenolphtalein offers a quick result but may be subject to false positives.  *See* D.P. Lyle, *Forensic Science* 167 (2012).  Serologists use both presumptive and confirmatory tests to determine whether blood is present.  *Id.* at 166.  Other testing is necessary to identify whether blood is of human origin.  *Id.* at 168.  Vosburgh testified to the preliminary test results during Givens's first trial in 1993, but the evidence was excluded from Givens's later trials, including his 2006 trial.

[6] Dr. Charlotte Word also testified about the DNA testing Cellmark performed on the Coca-Cola bottle.

wrench. Fowler further opined that the wrench matched the patterns of Kilpatrick's injuries. He asserted that, in his opinion "within a reasonable degree of medical certainty, an object which has the size, weight, and shape characteristics of that wrench caused the injuries to Mrs. Kilpatrick."

Defense counsel attempted to undermine Fowler's conclusions. They offered three expert witnesses, one on postmortem examination and two on forensic pathology, who disputed Fowler's assertion about the wrench. Two of the experts, one of whom had performed Kilpatrick's autopsy, testified that the injuries were not distinct and there was not sufficient evidence to match any patterns to the wrench or to conclude that the wrench caused the injuries. The third expert testified that the wrench was a "possible object" that could have caused the injuries, but there was not enough evidence to permit a conclusion that the wrench was the weapon.

Givens testified that on January 2, 1993, he ran into Jay Kilpatrick, the victim's son, and Jay's co-worker, Matt. All three drove together to Kilpatrick's home. Jay and Matt went into the house and Givens waited in the car. Givens testified that he entered the house about 15 minutes after they arrived, and Kilpatrick offered him a drink. Givens took a bottle of Coca-Cola from the fridge and drank from it. Givens claimed that he witnessed Jay arguing with his mother and striking her on the head. Givens stated that when he pulled Jay off of Kilpatrick, Jay drew a knife, told Givens to leave, and threatened to kill him and his family. Givens testified that he left, but he went to Jay's house to confront him the next day. Jay told Givens that he had beaten and stabbed his mother to death because she would

6

not give him money to pay the restitution required as a condition of Jay's probation. Givens denied that he killed Kilpatrick.

The jury again found Givens guilty of first-degree murder and he was sentenced to life without parole.

In 2011, Givens filed a petition for post-conviction relief for forensic testing.[7] Givens sought a renewed comparison analysis of the wrench, the autopsy report, and the photographs. He also requested short tandem repeat ("STR") DNA testing of the swab taken from the wrench. After a hearing, the Circuit Court denied the petition.

## DNA Testing Hearing Following Second Conviction

In January 2017, Givens filed a *pro se* petition for post-conviction DNA testing under CP § 8-201 in the Circuit Court for Anne Arundel County. On this occasion, Givens sought STR testing of the scraping obtained from the wrench, which was not available at the time the samples were initially tested in 1992. Givens asserted that STR testing could prove that the wrench was not the murder weapon and would "therefore constitute exculpatory evidence relevant to his claim of wrongful conviction." The State opposed Givens's petition, contending that because the evidence had previously been unsuccessfully tested, the scraping was not likely to contain adequate biological material for analysis. Further, the State argued that any results would not be exculpatory or mitigating.

---

[7] Givens has filed several petitions for post-conviction relief on various grounds. We limit our discussion to petitions seeking testing of forensic evidence, because the merits of his other claims for post-conviction relief are not before this Court.

After a hearing in June 2017, the Circuit Court denied Givens's petition. The hearing judge concluded that the method of DNA testing Givens sought—STR—was "very common," satisfies the *Frye-Reed*[8] standards, and is "accepted within the relevant scientific community." He agreed with the State that the sample "is very likely to have nothing probative left because it was used for three amplifications already[,]" but did not agree that it was a sufficiently compelling reason to deny Givens's petition. Rather, the hearing judge determined that under the facts of the case, there was no reasonable probability that the testing could produce exculpatory or mitigating evidence.

The judge set out his reasoning for that conclusion:

> And I also note that the [wrench] itself was not at trial. No one said unequivocally that the tool was matched to the blunt force trauma to the victim's head in this case. In fact, there were experts that had dueling testimony to that effect.
>
> ****
>
> But what the Court does find even more compelling than all of that, that is that it was a tool that was in his exclusive possession and not, say, found at the crime scene, is that you can only work through the four possibilities . . . .
>
> And that is the first three that were mentioned in the State's motion in this case, which is if it contained the victim's DNA profile, or at least one that matched to an incredibly high degree of scientific certainty. Then you would have something that is not exculpatory or mitigating, but rather, is inculpatory. Number one.

---

[8] *See Reed v. State*, 283 Md. 374 (1978) (standards for admissibility of scientific evidence); *see also Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), *superseded by Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).

8

> Number two, if it had Mr. Givens's DNA profile on it, or someone matching his profile, then it would only confirm that this was a tool in his possession.
>
> The third possibility would be that the test comes back inconclusive, and that if it were inconclusive, it would be at the same part and the same thing that the evidence—that the final jury heard in Mr. Givens's fifth trial.
>
> And of course, the fourth possibility is that it came back with another DNA.

The judge observed that Givens had claimed that Jay Kilpatrick gave him the wrench before the crime, and it was discovered in Givens's possession more than six months after the murder. From this, the judge reasoned that finding an unknown third party's DNA on the wrench would not be exculpatory or mitigating because the evidence at trial did not demonstrate that any DNA on the wrench matched a particular person. Accordingly, the hearing judge denied Givens's petition.

Givens sought review under CP § 8-201(k)(6), which permits a direct appeal to the Court of Appeals from an order of a Circuit Court entered under CP § 8-201. *See Arrington v. State*, 411 Md. 524, 544 (2009). We consider whether the lower court erred in denying Givens's petition for post-conviction DNA testing. We shall conclude that it did not.

## STANDARD OF REVIEW

We review a circuit court's determination of whether a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence for clear error. *Simms v. State*, 445 Md. 163, 185 (2015). "Under this standard, 'if there is any competent evidence to support the factual findings below, those findings

9

cannot be held to be clearly erroneous.'" *Id.* (quoting *Washington v. State*, 424 Md. 632, 651 (2012)).

## DISCUSSION

Givens argues that the Circuit Court committed clear error by finding that the wrench was not at trial and that "[n]o one said unequivocally that the tool was matched to the blunt force trauma to the victim's head in this case." At trial, the State relied on expert testimony that an object the size, shape, and weight of the wrench caused Kilpatrick's head injuries. Givens reasons that if the State is correct, any DNA on the wrench should be Kilpatrick's. But if the DNA does not match Kilpatrick, then it disproves the State's claim that the wrench was the murder weapon. This finding, he claims, would "mitigate, if not exculpate, him as the possible murderer[,]" and impeach the State's witness. Givens acknowledges that the results from testing the scraping proved "inconclusive," but contends that new testing procedures are more sophisticated.

The State argues that the wrench scraping is not scientific identification evidence because the wrench had already been tested, there was "insufficient biological material to produce a DNA profile," and any cells in the original scraping were consumed by the initial testing. Further, current DNA testing methods still rely upon polymerase chain reaction ("PCR") amplification to achieve the necessary amount of DNA for analysis. The original PCR amplifications did not result in testable DNA, and the record does not demonstrate that another round of amplification would be successful.

The State also maintains that any result obtained would not be exculpatory. The presence of Givens's DNA on the wrench would not be exculpatory because he owned the

10

wrench and it was in his possession for months. Finding Kilpatrick's DNA on the wrench would be inculpatory. If no usable DNA is found on the wrench, that would not be exculpatory because that is what the jury heard, and it still convicted Givens. If a third person's DNA is on the wrench, that would not be exculpatory because Givens has not claimed that someone else used the wrench to murder Kilpatrick—he asserts that the wrench was not the murder weapon.

## The Post-Conviction DNA Testing Statute

"DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." *District Atty's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009). Recognizing this important fact, in 2001, the General Assembly enacted CP § 8-201, which authorizes post-conviction DNA testing. The General Assembly intended the statute to serve as "a mechanism for a person who has been convicted of certain serious crimes to obtain exculpatory or mitigating evidence through the DNA testing of items related to that conviction." *Simms*, 445 Md. at 167.

CP § 8-201(b)(1) authorizes a person "convicted of a crime of violence"[9] to file a petition in circuit court seeking "DNA testing of scientific identification evidence that the State possesses that is related to the judgment of conviction . . . ." CP § 8-201(a)(5) defines "scientific identification evidence" as evidence that:

> (i)     is related to an investigation or prosecution that resulted
>         in a judgment of conviction;

---

[9] The individual must be convicted of a crime of violence as defined by Md. Code (2002, 2012 Repl. Vol.), § 14-101 of the Criminal Law Article. This statute was also amended recently. *See* 2018 Md. Laws, ch. 143.

(ii)     is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and

(iii)    contains **biological evidence[10] from which DNA may be recovered** that may **produce exculpatory or mitigating evidence relevant** to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

(Emphasis added).

CP § 8-201(d) requires the court to order DNA testing if the petitioner demonstrates that two conditions are met. *Simms*, 445 Md. at 169. First, the court must find that "a **reasonable probability exists** that the DNA testing has the scientific potential to produce **exculpatory or mitigating evidence** relevant to a claim of wrongful conviction or sentencing . . . ." CP § 8-201(d)(1)(i) (emphasis added). The court must also find that the "requested DNA test employs a method of testing generally accepted within the relevant scientific community." *Id.* (d)(1)(ii).

Under CP § 8-201(d), a "reasonable probability" requires more than mere possibility, rather, it is a fair likelihood that something is true. *Beaman v. State*, 453 Md. 407, 420 (2017). The petitioner's burden to demonstrate a reasonable probability that the evidence would be exculpatory does **not** require "establish[ing] that the result would have been different if the DNA results sought were known at the time of trial." *Edwards v. State*, 453 Md. 174, 196 (2017). The results need not exonerate the petitioner or prove that someone else committed the crime. *Id.* at 191. Rather, "exculpatory" in CP § 8-201 means

---

[10] "'Biological evidence' includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained." CP § 8-201(a)(2).

12

only "evidence that would **tend to** clear the accused of guilt, or **tend to** establish his or her innocence." *Id.* at 196 (emphasis added). To satisfy his burden, Givens must demonstrate that the testing he seeks has the scientific potential to produce evidence that would tend to show that he did not commit the crime, or that he is innocent.

### The Process Of Testing DNA

To fully understand the issues presented, it is necessary to discuss the processes utilized to test DNA. Polymerase chain reaction, or PCR, "magnifies short sequences of interest in a small number of DNA fragments into millions of exact copies." David H. Kaye & George Sensabaugh, *Reference Guide on DNA Identification Evidence*, *in Reference Manual on Scientific Evidence* 129, 143 (3d ed. 2011). PCR makes "it possible to analyze minute or degraded samples." *Young v. State*, 388 Md. 99, 108 (2005). PCR uses a three-step process to extract and amplify a DNA sample. *Id.* First, in "denaturization," the DNA is heated to separate the two strands of the double helix. Second, in the "annealing" process, primers[11] containing nucleotide sequences[12] complementary to the DNA region being amplified are added. Kaye & Sensabaugh, *supra*,

---

[11] "Primers are small, manmade pieces of DNA, usually between 15 and 30 nucleotides long, of known sequences." David H. Kaye & George Sensabaugh, *Reference Guide on DNA Identification Evidence*, *in Reference Manual on Scientific Evidence* 129, 143 (3d ed. 2011). The primers have complementary sequences to the locus of interest in the DNA. *Id.*

[12] DNA is made up of "subunits that include four chemical structures known as nucleotide bases." Kaye & Sensabaugh, *supra*, at 136. The structures are guanine, cytosine, thymine, and adenine. Lyle, *supra*, at 180. Cytosine only binds to guanine, and thymine only bonds with adenine. This bonding creates base pairs. Each individual has approximately three billion base pairs in his or her DNA. *Id.* The ordering of the bases is a sequence, e.g., GCAAAATTCGG. Kaye & Sensabaugh, *supra*, at 138.

13

at 143. The primers bond to the DNA when cooled. *Young*, 388 Md. at 108–09. Third, in "extension," the material is copied repeatedly to produce a larger sample of DNA for analysis. *Id.* at 109; *see also* Kaye & Sensabaugh, *supra*, at 143.

Whether DNA amplification is possible depends on the quantity of DNA available in the sample, and whether the DNA is severely degraded. Kaye & Sensabaugh, *supra*, at 151. Studies have demonstrated that, despite its hardiness, DNA may be degraded such that it cannot be analyzed. *Id.* at 153. "The extent to which degradation affects a PCR-based test depends on the size of the DNA segment to be amplified." *Id.* If amplification is successful, the resulting DNA can then be analyzed. PCR amplification is, as the State correctly points out, still in use today to amplify DNA for analysis in STR testing. *Id.* at 144; *see also Young*, 388 Md. at 109.

STRs are "very short repeating sequences of DNA that are three to seven bases long . . . ." D.P. Lyle, *Forensic Science* 184 (2012). Each person has a "variable number of STRs in any given locus" on his or her DNA. *Id.* at 186. It is possible to determine the number of any given STRs at a given locus. *Id.* That number varies from person to person and can be used to confirm if two samples came from the same person. *Id.* If it is known how often a specific number of STR repeats are found at a given locus in the general population, then experts can determine the statistical odds that the same individual is responsible for two samples. *Id.* at 186–87. A match from a single locus is generally not conclusive. If there are multiple matches from multiple loci, then the odds that a single person is responsible for both samples increase. *See Young,* 388 Md. at 110–11; *Lyle*, *supra*, at 187–88; A. Jamie Cuticchia, *Genetics: A Handbook for Lawyers* 86–87 (2d ed.

14

2018). Importantly, STR analysis of minute samples requires PCR amplification to achieve

sufficient DNA to analyze. *Young*, 388 Md. at 109; Cuticchia, *supra*, at 88–89; Kaye &

Sensabaugh, *supra* at 144; Lyle, *supra*, at 184–85.

In the early 1990s, when the DNA was first tested, analysis focused on the Human

Leukocyte Antigen DQ-Alpha ("HLA DQα").[13] HLA DQα relied on PCR amplification.

*See* Barry C. Scheck, *DNA and Daubert*, 15 Cardozo L. Rev. 1959, 1963 n.17 (1994). This

analysis has since been replaced by the "more discriminating" STR analysis. *See Osborne*,

557 U.S. at 60; Lyle, *supra*, at 185. "STR testing is considered 'the most widely used

testing in the field of molecular biology,' and importantly, 'it is the most commonly used

DNA testing in the criminal justice system.'" *Gregg v. State*, 409 Md. 698, 720 n.10 (2009)

(quoting Catherine Arcabasico, *Chimeras: Double the DNA—Double the Fun for Crime

Scene Investigators, Prosecutors and Defense Attorneys?*, 40 Akron L. Rev. 435, 499

(2007)). We agree with the Circuit Court that Givens has satisfied the requirement set forth

in CP § 8-201(d)(1)(ii) because he has shown that the "requested DNA test employs a

method of testing generally accepted within the relevant scientific community." *See, e.g.*,

*Gregg*, 409 Md. at 720; *Young*, 388 Md. at 105; Lyle, *supra*, at 185–86.

But, like the Circuit Court, our resolution instead turns on whether there is a

reasonable probability that testing the samples from the wrench has the "scientific potential

---

[13] "DQ Alpha testing is a relatively inexact form of DNA testing that can clear some wrongly accused individuals, but generally cannot narrow the perpetrator down to less than 5% of the population." *District Atty's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 57 (2009). Cellmark used this method in 1992 to conclude that Givens was a likely match for the saliva found on the Coca-Cola bottle in Kilpatrick's kitchen.

to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing . . . ." CP § 8-201(d)(1)(i). We examine whether STR testing is likely to produce anything of exculpatory or mitigating value relevant to Givens's claims.

The State maintains that the scraping is not scientific identification evidence under CP § 8-201(a)(5). It does not dispute that the wrench is related to Givens's prosecution—the State introduced the wrench at trial[14] and asserted that it was the likely murder weapon. *Id.* (a)(5)(i). The scraping remains in the State's possession. *Id.* (a)(5)(ii). The State contends that there is no biological evidence remaining in the scraping that could produce exculpatory or mitigating evidence because the attempts to amplify and test DNA in 1992 consumed the whole sample.[15] *Id.* (a)(5)(iii).

In *Wallace v. State*, 452 Md. 558, 577 (2017), we explained that "the 'may produce' language of [subsection] (a)(5)(iii) is equivalent to a 'mere possibility' or 'chance.'" This is a lower threshold than the "reasonable probability" standard in CP § 8-201(d)(1)(i). In short, if there is biological evidence from which DNA could **possibly** be recovered, which in turn could **possibly** produce exculpatory or mitigating evidence, then the statutory definition is met. *Id.* In determining whether the scraping is scientific identification evidence as defined by the statute, we "give due regard to the [circuit] court's role as fact-

---

[14] The hearing judge incorrectly stated that the wrench was not at Givens's trial. Nonetheless, this relatively minor error is not sufficient to render his conclusions clearly erroneous.

[15] The State pointed out that at the 2011 post-conviction hearing, the Circuit Court for Anne Arundel County denied Givens's petition to test the swab because it concluded that there was no biological material left for testing. Here, Givens seeks to test the scraping.

finder and will not set aside factual findings unless they are clearly erroneous." *Id.* at 573

(quoting *Phillips v. State*, 451 Md. 180, 189 (2017)).

When Givens was granted a new trial in 1999, the Circuit Court ordered re-testing

of several items of evidence, including the swab and scraping. The testing took place in

2002 at the Serological Research Institute. Preliminary tests for the presence of blood

revealed negative results and no further testing was attempted. At Givens's second trial in

2003, defense counsel opposed Vosburgh's testimony about the result of the 1992

preliminary test on the swab and scraping that showed a weak positive result for blood. At

that time, defense counsel acknowledged that it was likely that the 1992 attempt at PCR

amplification had removed any biological material.

After considering this information, as well as the 2011 post-conviction proceedings

that denied re-testing of the swab from the wrench, the hearing judge explained that "if the

argument were exclusively, well, it is likely that there is nothing left worthy of testing

because in the three prior amplifications it was essentially destroyed to get to that product,

then . . . .why speculate and why not try, right?" He found the State's contentions on this

point less persuasive "because technology obviously does get better over time and maybe

we are further along in our ability to extract [DNA] than we were in 2011." He did not

make an unambiguous finding as to whether the scraping was scientific identification

evidence under CP § 8-201(a)(5).

Our review of the record demonstrates that prior attempts at PCR amplification were

unsuccessful, and that it is unlikely that testable biological material remains in the scraping.

Nonetheless, we defer to the hearing judge's finding that there may be a chance that the

17

scraping contains biological evidence from which DNA could possibly be recovered. Therefore, we assume that the scraping satisfies the definition of scientific identification evidence set forth in CP § 8-201(a)(5). This means that our next task is to examine the basis of the post-conviction court's ruling—specifically that Givens had not satisfied his burden under CP § 8-201(d)(1)(i), by showing that the results of the testing had a reasonable probability of producing exculpatory or mitigating evidence.

### Exculpatory Or Mitigating Evidence

*Edwards* offers a useful illustration of when evidence is exculpatory. Edwards had been convicted of sexual offenses stemming from an attempted rape. 453 Md. at 178. The victim had been approached by a man who asked to borrow her lighter. The man used the lighter, entered the victim's car, and subsequently assaulted her. *Id.* at 179–80. Investigators recovered the lighter and other items the assailant might have touched. *Id.* at 180. Edwards sought testing of these items for epithelial DNA cells, arguing that if another individual's DNA profile appeared on the items, that would support his claim that he had been falsely identified as the assailant. *Id.* at 182–83.

We identified several relevant factors for courts to consider when assessing whether a reasonable probability exists that DNA testing for epithelial cells would produce exculpatory or mitigating evidence. Specifically, "the nature of the item (e.g., whether it is an instrumentality of the crime), the physical proximity between where the item was located and where the crime occurred, and the temporal proximity between when the perpetrator touched the item and when the crime occurred." *Id.* at 199. Applying these factors, testing that showed an absence of Edwards's DNA on the lighter would tend to

18

exculpate him because, although the lighter was not an instrumentality, it was located at the crime scene, and the perpetrator used the lighter directly before the assault. *Id.* at 199–200.

On the other hand, *Beaman* demonstrates when the results of testing would not be exculpatory. In *Beaman*, the petitioner, who had been convicted of four counts of first-degree murder and other related charges, sought DNA testing of blood found at a crime scene. 453 Md. at 409. Three victims were found inside an apartment. The fourth victim was found outside the building. Investigators located blood on a patio directly below the apartment's window. The State's theory was that the victim found outside had jumped through the window to escape and was shot while he jumped. *Id.* at 410. An eyewitness saw two men running past and identified Beaman as one of the men. *Id.* at 411.

Beaman sought testing to prove that the blood on the patio belonged to the victim. This, he reasoned, would prove that the witness misidentified him, and that the man she identified was actually the fourth victim. *Id.* at 420. We concluded that even if the blood did belong to the fourth victim, it would not tend to establish Beaman's innocence. The State had argued at trial that the blood belonged to the victim. Conclusively establishing that fact "would not logically support the conclusion that [the witness] saw the victim and not [Beaman]." *Id.* at 421. Thus, there was no reasonable probability that the testing could produce exculpatory or mitigating evidence. *Id.*

To assess whether a reasonable probability exists that test results could produce exculpatory or mitigating evidence, a court must examine the facts of the crime, as well as the petitioner's assertions. *See id.* at 420–21; *Edwards*, 453 Md. at 199. We consider that

19

some of the factors set forth in *Edwards* are relevant here, specifically, the nature of the item and the proximity between where the item was located and where the crime occurred. *Edwards*, 453 Md. at 199. Other relevant factors include the temporal proximity between the crime and the discovery of the item, the condition of the item, and the evidence the jury heard regarding that item. *See Beaman*, 453 Md. at 420–21.

Although here, as in *Edwards*, there is a connection between the item (the scraping from the wrench) and Givens's claim (the wrench is not the murder weapon), most of the evidence connecting the wrench to the murder was circumstantial. The wrench was not located at the crime scene—it was found in Givens's toolbox seven months later. The jury heard conflicting expert testimony about whether the wrench could have caused Kilpatrick's injuries. In every trial after Givens's first successful petition for post-conviction relief in 1999, including the most recent one, the jury has heard that there were no test results that could show with any reasonable degree of scientific certainty that human blood or tissue were on the wrench. The State's expert, Dr. Word, testified that attempts to test material from the wrench for DNA produced no result. She explained that cleaning could potentially degrade or remove biological material and inhibit results, or PCR amplification could have failed because there was insufficient DNA, or no DNA whatsoever.

Givens maintains that the results of DNA testing of the scraping would be exculpatory because if the wrench is the murder weapon, then any DNA must be consistent with the victim. He argues that if the DNA does not match, then the State's claim that the wrench was the weapon is "untenable," or at least would "impeach" the State's experts.

20

Givens acknowledges that if the DNA matches Kilpatrick, that result would be inculpatory. As we explained in *Edwards*, 453 Md. at 187, a petitioner does not have to establish that the results in every instance would be exculpatory. But the petitioner must demonstrate that there is a reasonable probability that some result would be exculpatory or mitigating. *Id.* at 196.

In considering the other possibilities that might result from DNA testing, we observe that Givens has admitted ownership of the wrench and maintains that it was in his possession before and after the murder. Finding Givens's DNA on the wrench is not exculpatory **or** inculpatory. If Givens had used the wrench to attack Kilpatrick and subsequently cleaned it, his DNA could very well be on the wrench. Or his DNA could have been on the wrench from handling it in the course of ordinary use. Finding Givens's DNA on the wrench would not "tend to clear . . . [him] of guilt, or tend to establish his . . . innocence." *Id.* at 196. Such a result would certainly not undermine the State's experts.

There are two more possibilities. First, that testing again fails to recover any DNA in the scraping. The second, which Givens considers the more desirable result, is that testing reveals an unknown individual's DNA in the scraping. We examine each.

The failure to obtain a test result is consistent with the evidence used to convict Givens. In *Beaman*, 453 Md. at 420, the State argued at trial that the blood belonged to the victim—it had never suggested that it belonged to the perpetrator. Here, the State had not argued that there was DNA evidence that connected the wrench to the victim or the

21

perpetrator.[16]  Rather, it offered an expert who testified that an item the size, shape, and weight of the wrench likely caused the injuries to Kilpatrick's skull, an expert who testified that the wrench was unusually clean in comparison to Givens's other tools, and experts who explained why there might not be any DNA on the wrench.  The absence of DNA does not tend to clear Givens of guilt or establish that he was innocent.  It simply maintains the status quo.

Givens contends that finding another DNA profile would impeach the State's expert because the State theorized that Givens had washed the wrench.  But finding an unknown individual's DNA in the scraping would not eliminate the wrench from consideration as the murder weapon.  Givens could have used the wrench to murder Kilpatrick, washed the wrench, and then placed it back in his tool box where another person might have touched it and left behind DNA.  Finding a third party's DNA would not suggest that someone else committed the crime with the wrench.  Instead, it would only show that someone else touched the wrench at some point.

In *Edwards*, the lighter was found at the crime scene, shortly after the crime took place.  There, the presence of an unknown individual's DNA on the lighter, as opposed to Edwards's DNA, would have tended to prove innocence because the perpetrator handled the lighter immediately before the assault.  453 Md. at 198.  Here, the wrench was found

---

[16] In *Edwards v. State*, 453 Md. 174, 197 (2017), we concluded that the fact that jurors were told that there was no forensic evidence that linked Edwards to the attempted rape did not "detract from the fact that DNA testing might rule out the presence of [Edwards's] DNA on the items tested."  In that case, however, the lighter had not been tested. *Id.* at 180.  Here, the items were tested, and the jury was told the result.

seven months after the crime in an entirely different location. It is unknown whether other individuals handled the wrench during that time. But the only logical conclusion is that the extended period of time between the crime and the wrench's discovery only **increased** the chance of exposure to another person's DNA. As such, the presence of another DNA profile would not tend to prove anything.

We agree with the Circuit Court that any results of testing would not tend to clear Givens's guilt or establish his innocence. *See id.* at 196. Although DNA testing is a powerful tool, it is not a universal solution. As the United States Supreme Court explained in *Osborne*, 557 U.S. at 62,

> DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. . . . The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt.

The State used circumstantial evidence to establish Givens's guilt and offered logical explanations for why DNA testing of the samples from the wrench did not lead to results. Givens has failed to show that there is a reasonable probability that the results of any testing, assuming that adequate DNA could be amplified, would be exculpatory or mitigating.

## CONCLUSION

We hold that Givens has failed to establish that a reasonable probability exists that DNA testing has the scientific potential to produce exculpatory or mitigating evidence.

23

The circumstances of the crime and the available evidence reflect that any results of the testing would not produce exculpatory or mitigating evidence.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**